MATHEWS *v.* COTHRAN.

5-59                                                           259 S. W. 2d 504

Opinion delivered July 6, 1953.

*Mark E. Woolsey,* for appellant.

*John J. Cravens, Jeta Taylor* and *G. C. Carter,* for appellee.

GRIFFIN SMITH, Chief Justice. William Mathews owned 320 acres in the Ozark district of Franklin county. He was 70 years old and without wife or child when the deed resulting in this litigation was executed. One dollar "and other good and valuable considerations to us in hand paid" were recitals in the instrument dated September 12, 1951. The grantee is Mathews' niece, who is the appellee here.

On January 23, 1952, Mathews sued for cancellation. He alleged that the deed was given with the understanding that Lillian would move from California to the plaintiff's home and care for him during the period of his declining years and impaired health. The beneficiary, he said, had failed to render the contemplated services. On the contrary she had returned to California with her husband and had no intention of complying with conditions that Mathews contended were inducements to the transaction.

Following the trial Mathews died. The cause was revived in the names of Chesley O'Neal and E. W. Pillstrom, devisees under Mathews' last will.

In executing the deed the land was described as being in township nine north when in fact the tract was in township eight.

The trial court refused to cancel the deed for failure of consideration, but decreed reformation. Title was vested in appellee.

Mathews testified that the niece he intended (conditionally) to favor was the daughter of his brother, Ira. Ira and the niece and her husband—all living in California—had conducted correspondence with Mathews prior to the time the deed was executed. In March, 1950 Mathews named Lillian as sole beneficiary in a will. One of the letters written for Ira by his daughter mentioned uncertainties regarding Lillian's position in respect of the property, the inference being that the will might be contested.

Mathews testified that after the will was made Lillian and her husband visited with him for about three weeks.

This was in October, 1950. When the couple returned to California Mathews went with them and remained for less than a month. His illness was growing progressively worse and he felt that, having spent so many years in the Ozark area, he was better off there. A letter received from Ira (rewritten by Lillian and enclosed with one from her) was dated December 9, 1950. Ira complained that he had not been treated as a brother. He referred to "that dirty bunch"—a group composed of individuals "who didn't want you to have anything for your work, while taking care of Father and Mother". The suggestion was that Mathews should "get everything put in Lillian's name". Mention was made of money in the bank. The comment was: "If you leave it there you will have to pay income tax—and it will be plenty. Get wise to yourself and act now—get things fixed up . . . . Later may be too late".

In August, 1951, Lillian's husband wrote Mathews that he had information indicating that the will would be contested. He mentioned a rumor that Mathews was considering a sale of the property, then added, "But if it was mine I would sell it at all, because I really like it down there". [Apparently "wouldn't" was intended, rather than "would"].

In September, 1951, Lillian and her mother visited Mathews and spent two weeks with him. Mathews says that when they were preparing to leave he told Lillian he would deed the place to her "if they would come back and stay with me". Whether "they" refers to Lillian and her mother, or Lillian and her husband, is somewhat obscure; but the witness very definitely stated that Lillian promised to come back and stay with him. There was no objection when Mathews was asked if Lillian paid anything for the deed. He said that she did not.

Shortly thereafter Lillian and her husband and children shipped their furniture from California and moved into the Mathews home. They remained less than four months, returning to California in January. When asked how he treated these relatives during the period

they remained with him, Mathews said: "Well, as bad as I was feeling I treated them just as near right as I could—as good as I could—but I was sick practically all the time . . . . They wanted me to go back [to California] with them, and that's all I can tell you. I wasn't able. I couldn't stand it back there because I wouldn't live long enough".

On cross-examination Mathews readily admitted that the will he executed in Lillian's favor was a voluntary act, that he loved her at that time and still did, but that she and her husband were non-cooperative while on the farm. They would "lie up in bed" during the morning and supplied little if any assistance on the farm:—"They wouldn't help me take care of the cattle, and I told them right at the start that I would have to sell them".

Lillian's testimony directly contradicts statements made by her uncle. She accompanied the grantor to Johnson's abstract office where the deed was made and where the uncle said, "I want the property to be yours today". Johnson asked if any consideration was to be mentioned and Mathews replied, "The place is to be all yours today without any consideration". It was at Johnson's suggestion that the one dollar consideration was inserted. Mathews left the deed at the recorder's office, but procured it later and gave it to Lillian when she moved to the farm.

Woodrow Cothran, appellee's husband, was in California when the deed was executed and therefore did not know what transpired between his wife and her uncle regarding it.

Johnson's recollection was that when Mathews was asked if any consideration was to be shown in the deed the maker replied, "No, I'm giving it to her". The dollar recital was Johnson's voluntary act.

Lillian returned to California almost immediately after the deed was executed, but shortly thereafter received a letter from Margaret O'Neal stating that Lillian's Uncle William was ill. After discussing the matter with her husband, Lillian concluded to return to Arkan-

sas "as soon as we could and stay with [Uncle William] until he was better". Expenses incurred, including the return to California, amounted to $984.

Testifying further, Lillian said that when she and her family moved to the farm she wanted to build an outside toilet, but her uncle objected:—"We wanted to have our cook stove (gas) changed to butane, but he objected. He did not want us to use curtains or rugs. He objected to cutting weeds—just let them go . . . . It was impossible to make our home with my uncle, and my husband could not find work".

Mathews testified that the property was worth $15,000.

In a letter addressed to the attorney *ad litem* explaining her understanding of relationships, Lillian wrote: "There was no agreement made whatever, verbal or otherwise. But I knew he wanted some one with him, although he never said or did I ask".

It is readily understandable that Lillian and her husband— with their two small children—were not satisfied with the rural district into which they moved. Lillian's husband had been employed by North American Aviation as a drophammer operator. The California environment and their mode of living were no doubt more agreeable to taste and personal contacts and desires than the somewhat drab existence emphasized by Lillian as a would-be homemaker on the farm in Franklin county. Mathews preferred the place to California. To him it was home, with all that the word implied.

It is noteworthy that the uncle Lillian pictures as one who acted upon impulses of love and affection to the exclusion of his own right to remain upon the premises did not deliver the deed until the family moved from California. There is no hint that Lillian would have dispossessed the old man. On the contrary she testified that when the deed was being drawn she volunteered the suggestion that a life estate be retained, and that Uncle William replied, in effect, that he wanted to close the transaction as of that date.

It is argued that the deed was not subject to reformation, having been voluntarily executed as a mere gratuity, "and lacking in the elements of a contract," *Nelson v. Hall,* 171 Ark. 683, 285 S. W. 386; *Wells v. Smith,* 198 Ark. 476, 129 S. W. 2d 251. But the grantor contended that it was not a gratuity, and that contractual elements were present. If we accept Lillian's version, there was a gift and reformation would not lie. On the other hand, if we read into the transaction Lillian's admission that she knew Uncle William wanted some one to be with him, there has been supplied the natural inference that Lillian understood the deed was predicated upon reciprocal duties.

We do not find it necessary to decide this question. Our conclusion is that the evidence preponderates in favor of Mathews' statements that before the deed was executed uncle and niece understood what was expected. Just how this understanding was expressed—whether in particular words or conduct upon which the grantor had a right to rely—this is immaterial. The deed was not immediately delivered. Lillian and her family promptly moved to the farm. It is unreasonable to believe that they shipped their furniture and that Lillian's husband gave up his aircraft job without reason. The conduct is not harmonious with a stay in Franklin county limited to Mathews' illness then thought by appellee to be of a temporary character. Rather, leaving California was the act of a family making a definite move for a positive purpose; and the record supports the conclusion that life on the farm was found to be irksome and that the uncle's illness and irritability were more than appellee and her husband had expected.

This is understandable and appellee could not be prevented from abandoning her contract. But she could not toss it aside and still receive its benefits unless Mathews' conduct had the effect of driving them away. Our conclusion is that Lillian made her election, hoping that Uncle William would follow the family to California. That he did not choose to do so has proved unfortunate

from Lillian's material standpoint, for the decree must be reversed with directions to cancel the deed.